Bouldin, J.
It is perhaps unnecessary to decide in this case, whether the written contract of the 11th of July 1843, between Stuart and Seely, could be waived or rescinded by a subsequent parol agreement, as it is apparent, as well from the theory of the bill, as from the proofs in the cause, that all that was done by Stuart in that respect, was done not only with the full knowledge and consent of Seely, but in fact at his instance and request. Under such circumstances Seely would be estopped in a court of equity from setting up any claim or interest in himself in derogation of the act of Stuart, thus assented to and authorized by himself. But the question, whether the contract of the 11th of July 1843, could be thus waived or rescinded, has been very earnestly and elaborately argued by learned counsel on both sides of this case ; and it may be expected, and is perhaps proper, that the views of the court on that question should be expressed.
*585 No rule of law is better established as a general rule than this,—that a written contract, whether under seal or not, and whether relating to land or not, cannot be explained, varied, or controlled by parol evidence. But that is not the question before us. The question is, whether an executory contract in writing, creating an equitable interest in land, may not in equity be rescinded, waived or abandoned by a subsequent distinct and independent parol agreement between the parties, partially acted on or fully performed by them.
If part performance of an original parol contract be sufficient in a court of equity to withdraw the case from the operation and influence of the statute of frauds, as it unquestionably is, no good reason is perceived, why part or full performance of a subsequent distinct and independent parol contract, rescinding the former contract for full consideration, and substituting another in its place, should not in like manner withdraw the latter contract from the influence of the statute. The principle of the two cases would seem to be precisely'the same.
But we are not left to mere analogy. The precise question seems to have been decided in more than one case both in England and America. In a note to the case of Pym v. Blackburn, 3 Ves. R. 34, 40, the annotator, after citing among other cases, the cases of Goman v. Salisbury, 1 Vern. R. 240, and Legal v. Miller, 2 Ves. Sr. R. 299, says, “In each of the last two cases, an agreement executed according to the statute, was discharged by a subsequent parol agreement, of which evidence was given, on the ground of part performance. Eor this purpose the evidence must prove a distinct subsequent, independent agreement.”
In the case of Rich v. Jackson, reported in a note to the subsequent case of the Marquis of Townshend v. Stangroom, 6 Ves. R. p. 334-5-6, Lord Hardwicke’s opinion that parol evidence is admissible to rebut an equity, was approved; and it was held that the rule which denies *586 the right to vary by parol the effect of a written agreement within the statute of frauds does “not affect the case of a subsequent, distinct, collateral agreement.” And in Price v. Dyer, 17 Ves. R. 585, 363-4, Sir William Grant, after saying that the case then before him did not render it necessary for him to express an opinion directly on the question, whether a written contract in relation to land could be waived or discharged by parol, says, “But as at present advised, I incline to think, that upon the doctrine of this court such would be the effect of a parol waiver, clearly and satisfactorily proved ;” but he goes on to say, “ but here there was no such waiver. The waiver spoken of in the cases, is an entire abandonment and dissolution of the contract restoring the parties to their former condition.”
Such, however, was precisely the character and purpose of the abandonment and dissolution of the contract in this case, between Stuart and Seely as proved by Stuart. The American cases are to the same effect as the English.
Mr. Hilliard in his work on Vendors, ch. 10, § 19, p. 173, says, “And the general rule iá, that a written agreement within the statute of frauds may be varied by a subsequent parol, distinct and collateral agreement;” citing among others the following American cases, viz : Dearborn v. Cross & al., 7 Cow. R. 48, and Baldwin v. Salter, 8 Paige R. 473.
In the first ease, Dearborn v. Cross, the plaintiff' sold a dwelling-house and distillery to the defendant, gave him a bond to make the title, took from him his several notes for the consideration, and delivered to him the possession of the premises.
One of the notes given in consideration of the sale, was afterwards put in suit; and the defence at the trial was, that the contract of sale had been rescinded by a verbal agreement between the parties ; and that the plaintiff pursuant to that agreement, and with defendant’s *587 consent, had re-entered upon and i’ented the house, and finally sold the whole premises to another. The title ,bond, however, had never been delivered up or can-celled. The defence was overruled by the Circuit court, upon the ground that the contract could not be rescinded by a parol agreement of this discription; that it could be discharged only by a release, or a surrender and cancelling of the contract. The case was taken to the Supreme court of New York, which held that no action would lie on the note, the whole contract of sale being discharged by the new, parol, executed agreement. The court say, p. 49, “The evidence given and that which was offered to be given, show not merely an executory agreement to rescind the contract, but an agreement executed and carried into effect, by a surrender of the possession and a subsequent sale of the premises.” And after citing several pertinent authorities, the court goes on to Bay, “the defendant Cross, therefore, could not enforce this contract against the plaintiff; and there seems to be no necessity for sending him to a court of equity in order to restrain the plaintiff from collecting the notes, which were the consideration of the contract.”
There is a very striking analogy between the case of Dearborn v. Cross and the case before us. There is in this case clear and conclusive proof of a subsequent, distinct and independent parol agreement, between Stuart and Seely, by which the contract of sale was abandoned and rescinded; and this agreement was acted on and fully executed by the subsequent sale of the property by Stuart to Mrs. Phelps, with the consent and at the instance of Seely, and by Seely’s surrender in effect, of the premises to Mrs. Phelps by his acceptance of the position of her tenant. Under such circumstances, my opinion is, that the contract of sale, whether surrendered for cancellation or not, was wholly rescinded, and that the parties were restored to their former position.
The next and only other question necessary to be con *588 siderecl is, whether at the time of the deed from Stuart to Mrs. Phelps, or prior thereto, there was any understanding or agreement between Mrs. Phelps and Seely, that the money paid or to be paid by Mrs. Phelps for the land, should be advanced by her as a loan to Seely, and that she was to take a deed for the land from Stuart directly to herself, as a security for the loan. Eo such agreement appeared on the face of the deed; and if it existed it must be established by testimony. The question is, therefore, one of fact only. .
Was any such agreement made ? Mrs. Phelps, in her answer to the bill, denies emphatically “ that she was mortgagee of the property, or that she bought it subject to any trust, condition or understanding with Mr. Seely, or any one else, that he was to have the right to redeem it by refunding to her the purchase money.” She says that any such arrangement would have been perfectly idle, as Mr. Seely wras hopelessly and notoriously insolvent, and the w7hole transaction w7as founded on the knowledge of that fact. She admits that she made the purchase with a view “to befriend Mr. Seely and his family,” and thinks it probable that if, in a reasonable time, Mr. Seely had been able to re-purchase the property at the price paid by her, she would have let him have it, not under any legal or moral obligation, “but purely as a matter of personal favor to him.” This is the substance of her answer, and it amounts to an emphatic and unequivocal denial of the loan and mortgage. Mr. Stuart, who sold her the property and made the deed, looked on it as an absolute conveyance to Mrs. Phelps, without reservation or condition, having heard nothing to the contrary from any of the parties. So far from it, when his contract with Seely was rescinded, the latter informed him that he was utterly unable to complete his purchase from him, but that Mrs. Phelps would buy the lot at the same price—$440. If it was to be an advance for him, it is reasonable to suppose that *589 he would have said so, iustead of speaking of it as a purchase by her. And Mr. Morgan, the son-in-law of Mrs. Phelps, and the active agent between the parties— privy, as be says, to the whole transaction—took the same view of the matter, never having heard, as he proves, of any loan or mortgage. On the contrary, he proves that Mr. Seely acknowledged himself unable to complete his purchase, and that he requested Mrs, Phelps to take his place and buy the property from Mr. Stuart; which she did.
This is all we have from the persons immediately cognizant of and party and privy to the transactions occurring at and prior to the date of the deed, except the subsequent admission of Seely himself, that he was debtor to Mrs. Phelps for the rent of the property, and would pay it when able—an admission utterly inconsistent with the idea that he owned the property, subject only to an encumbrance. Against all this there is nothing in the record but the loose and unsatisfactory testimony of several witnesses, testifying to vague and indefinite declarations and admissions of Mrs. Phelps, made long after the date of the transaction—declarations and admissions not only having no direct reference either to a loan or mortgage, but all of them applyiog as forcibly to the position of Mrs. Phelps as to the pretensions of the appellee.
There is no doubt that a resulting trust may be set up by parol testimony against the letter of a deed; and it is also true that a deed absolute on its face may, by like testimony, be proved to be only a mortgage; but the testimony to produce these results must, in each case, be clear and unquestionable. Vague and indefinite declarations and admissions long after the fact, such as have been relied on in this case, have always been regarded—and I think with good reason—as unsatisfactory and insufficient.
In Lench v. Lench, 10 Ves. R. 511, 517-18, Sir Wm. *590 Grant, speaking of parol evidence of subsequent admissions or declarations to establish a trust, says: “The witness swears to no fact or circumstance capable of being investigated or contradicted, but merely to a naked declaration of the purchaser admitting that the purchase was made with trust money. That is in all cases most unsatisfactory evidence, on account of the facility with which it may be fabricated and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect' of the declaration.”
And so in Bostford v. Burr, 2 Johns. Ch. R. 405, 411, Chancellor Kent, commenting on the parol testimony by which a trust was sought to be engrafted on a written, instrument, says: “This is a remarkable instance of the inaccuracy and fallacy of parol testimony, and shows the great danger there is of giving much latitude to these implied trusts founded on naked declarations in opposition to the solemnity and certainty of written documents.”
The case of Bostford v. Burr will be found, in all of its essential features, to be very much like the case before us, but with this difference, that the testimony in that case tending to establish parol admissions of the trust was much more direct and pertinent than any offered in this; yet Chancellor Kent held that it was wholly insufficient to change the terms of the deed. He said, page 412, “all the proof seems to consist of the confessions of the defendant; yet those confessions will, most of them, apply as well to the pretence of the one side as the other”; and in noticing and commenting on the testimony, he quotes, with approbation, the language of Sir William Grant in Lench v. Lench, already referred to.
How, it will be seen that Mrs. Phelps had always expressed a willingness and a purpose “to befriend Mr. Seely and his family ”—to provide for them a home in *591 their destitute condition—not, however, as a matter of obligation and contract, but purely of kindness and favor; and she admits in her answer that she purchased the property with that view, and would, within any reasonable time, have re-sold it to Seely at the same price, had he been able to make the purchase. ■ All her acts and declarations, as proved in the cause, are entirely consistent with this position. By none of them did she ever admit that there was either a loan or a mortgage: on the contrary, Col. Harman, one of the witnesses relied on to establish the mortgage, proves distinctly that he regarded the provision inteuded by Mrs. Phelps for Mr. Seely and his family to be purely a matter of favor.
My opinion is, that such testimony, long after the execution of the deed, is not sufficient .to alter and overthrow its plain terms, supported as it is by the statements on oath of Mrs. Phelps, in her answer; by the direct and positive testimony of Morgan, the active agent between the parties, privy to the whole transaction ; by the positive and negative testimony of Stuart, the grantor; and by the subsequent solemn, admission of Seely himself, iu writing, that he was debtor to Mrs. Phelps for the rent of the property, and would pay the same when able.
Upon the pleadings and proofs in the cause my opinion is, that from and after the date of her purchase from Stuart, Mrs. Phelps was entitled to the property in controversy absolutely, and without reservation or condition, whensoever she might think proper to demand the possession thereof; that as matter of favor, and not of contract, she allowed Mr. Seely and his family to enjoy the property without rent for more than twenty years— until, in fact, both Seely and wife, the chief objects of her bounty, were dead; and that in so doing she fully discharged all obligations of duty and charity.
The decrees of the District and Circuit courts must be *592 reversed, with costs to the appellant, and the bill dismissed.
Moncure, P., and Christian and Anderson, Js. concurred in the opinion of Bouldin, J.
Staples, J. dissented.
The decree is as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that the said decrees of the said District court and the said Circuit court are both erroneous. Therefore, it is decreed and ordered that the said decrees of the said District court and of the said Circuit court be reversed and annulled ; and that the appellees, Mary A. Seely and Samuel Paul, sheriff of Augusta county, and as such administrator of Horace Seely, deceased, out of the assets of his intestate in his hands to be administered, do pay unto the appellant his costs by him about his suit in this behalf expended, and also his costs in said District court expended; and this court proceeding to pronounce such decree as the said Circut court ought to have rendered: it is further decreed and ordered that the plaintiff’s bill be dismissed, and that she do pay unto the defendants their costs by them about their defence in the said Circuit court expended ; which is ordered to be certified to the said Circuit court of Augusta county.
Decree oe District court oe Appeals and Circuit COURT REVERSED.