# Richmond.

## DONAGHE AND ALS. V. TAMS AND ALS.

### DECEMBER 3d, 1885.

1. RESULTING TRUSTS—*Parol evidence.*—Where one with another's money buys an estate and takes the conveyance in his own name, by presumption of law, a trust results in favor of him whose money is thus used. Such trust may be established by parol proof, but the proof must be clear and unquestionable. *Sinclair* v. *Sinclair*, 79 Va. 40.

2. IDEM—*Pleadings—Proof.*—Plaintiff, claiming to be *cestui que trust* against grantee in a fee-simple deed of conveyance, must not only state his case in his bill with particularity and perspicuity as to when, how, and with what he paid the purchase money, but must also support his statement by proof of great clearness and certainty.

3. IDEM—*Declarations of grantee.*—Evidence of grantee's declarations in favor of the resulting trust, offered when not susceptible of contradiction, must be taken with allowance.

4. IDEM.—*Case at bar* is one where the proof of the payment of the purchase money with the funds of the plaintiff claiming to be the *cestui que trust* of the property in controversy, was held to be insufficient to establish the claim.

Appeal from decree of the circuit court of Augusta county, rendered December 8, 1884, in the cause wherein Mrs. Marie A. Tams was plaintiff, and Mrs. Virginia B. Donaghe, widow of the late Dr. Briscoe B. Donaghe, and her children, Mary Donaghe Mauzy, widow of the late Anderson S. Mauzy, Charles D. Hutcheson and Florence Lee Donaghe, his wife, Virginia B. Donaghe, an infant, and Wm. D. Runnels, sergeant of the city of Staunton, and as such administrator of Briscoe B. Donaghe,

deceased, and others, were defendants. Heard at Staunton, but decided at Richmond. By deed dated August 16, 1866, but delivered January 12, 1867, William H. Tams, as trustee, conveyed a certain house and lot in said city, which was known as "the banking-house property," to Dr. Briscoe B. Donaghe, which he had to him sold by writing dated November 18, 1865, whereon were endorsed the receipts for the different instalments of the purchase money, which was $5,500.00 In June, 1881, about eight years after the decease of her husband, and about two years after the decease of Dr. Donaghe, Mrs. Marie A. Tams instituted this suit, claiming that the said house and lot had been purchased for her, and paid for with the proceeds of certain securities which she had furnished Dr. Donaghe for that purpose ; that a trust had thereupon resulted by law in her favor in the said property, though the same had been conveyed in fee-simple to Dr. Donaghe, and that she was entitled to have a conveyance thereof. The defendants, by their answers, denied her claim. Considerable evidence was adduced on either side. The circuit court decreed according to the prayer of the complainant, and the defendants appealed to this court.

Opinion states the case.

*George M. Harrison*, for the appellants.

*Sheffey & Bumgardner*, for the appellees.

FAUNTLEROY, J., delivered the opinion of the court.

The record of the cause presents the following case: William H. Tams, late of the city of Staunton, Va., was the cashier of the "Central Bank of Virginia," from the time of its institution, about the year 1853, up to the time of its suspension in 1865.

On the 16th of August, 1865, the said Bank conveyed all of its assets—real and personal—to said Wm. H. Tams, as trustee, to be sold and realized upon and applied to the payment of its debts. The only piece of real estate owned by said Bank, and which was conveyed by said deed of trust to said William H. Tams, was the house and lot, in controversy in this cause, situated on Beverly street, in Staunton, Va., known and used as the "Old Central Bank property," and which was built so that the street-floor was adapted and used, in part, for banking purposes, with a residence for the use of the cashier in the residue of the said building.

By authority vested in the said William H. Tams, as trustee, under the deed of trust aforesaid, he sold the said banking-house property, on the 18th day of November, 1865, to Dr. Briscoe B. Donaghe, for the sum of $5,500, as set forth in a contract in writing, signed by the said parties, and now filed as part of the record in this cause. Under the terms of the said contract of sale, said Tams reserved, as a part of the consideration, the use of the dwelling-house portion of the said building for two years, and also a portion of the banking-house part, for his purposes as trustee in winding up the business of the old bank under the deed of trust aforesaid.

On the 20th day of November, 1865, the said Donaghe paid on the said purchase $3,000, as appears from the receipt of William H. Tams, trustee, to him, written on the said contract of sale. On the 4th December, 1865, the said Donaghe paid, on the said purchase, a further payment of $500, which was receipted for by the said William H. Tams, trustee, written upon the said contract. On the 12th day of January, 1867, said Donaghe paid the residue of the said purchase money, amounting, principal and interest, to the sum of $2,139.77; and thereupon, the said William H. Tams, trustee, delivered to said Donaghe a deed of conveyance for the said property,

which had been prepared and executed by him on the 16th day of August, 1866, and which acknowledged the receipt of the entire purchase money from said Donaghe, and covenanted for special warranty of title ("but subject to the provision of a written article of agreement between the parties hereto as to the possession of the property herein conveyed, and dated November 18th, 1865"). The said Donaghe received the said deed, and placed the same on record in the clerk's office of the county court of Augusta county, and paid for recording the same.

Very soon after this sale to Dr. Donaghe by William H. Tams, trustee, the said Tams commenced the business of a broker, in connection with others, under the firm name and style of William H. Tams & Co., and occupied this old Central Building for the purpose, as the *tenant of the said Donaghe*. This business was soon succeeded by the "Virginia Insurance Company"—a banking concern of which said Tams was cashier—which continued to occupy the said property, *as the tenant of said Donaghe*. This last named business was succeeded by the "Virginia Banking and Trust Company," of which said Tams continued as cashier, and which remained in said building, *as the tenant of said Donaghe*, up to the time of its suspension in 1875.

At the time of the sale of this Central Bank property by Tams, trustee, to B. B. Donaghe, as aforesaid, November 18th, 1865, the said Donaghe was (as shown by the evidence in the record) a wealthy man, with ample ready means, and was one of the few, if not the only person in Staunton, at that time, who was able to buy the said property and pay for it in the time said Donaghe did.

William H. Tams and Dr. B. B. Donaghe were very intimate personal friends; and, from the date of the purchase of this property by said Donaghe to the date of William H.

Tams' death, in August, 1873, and for a time thereafter, said Donaghe kept his bank account with said Tams, and transacted all of his business through said Tams and the several institutions aforesaid, of which said Tams was the head, doing business in the said old Central Bank building.    Tams was the business adviser and financial agent of said Donaghe, and to his hands was committed the management of the entire business of said Donaghe.

The bank account of said Donaghe, kept with said Tams, running from early in 1866 to October, 1874, shows that said Tams charged said Donaghe regularly, to the day of Tams' death, in August, 1873, with the taxes and costs of insurance upon the said property, and credited the said Donaghe regularly thereon, with *rent* for the said building, at the rate of $500 per year, up to the date of his (Tams') death, in August, 1873.    And it further appears from the record filed as evidence in this suit, of the common law suit of *Hendren & Echols, Trustees of the Virginia Banking and Trust Company* v. *B. B. Donaghe,* brought in the circuit court of Augusta county, at the March term, 1876, to recover from said Donaghe the amount of a draft due said company, that said Donaghe filed, as an offset to the said claim, an account for *rent* due him for the said building which was occupied by the said company after said Tams' death; and upon that plea and offset, the said circuit court gave *judgment for said Donaghe.*

At the November term, 1866, of the circuit court of Augusta county, one Robert G. Bickle, of Staunton, filed a bill in the said court against William H. Tams, trustee of the Central Bank, charging, among other things, that said Tams was himself the real purchaser of the property, and for an inadequate price ; that said Tams was removing from the said premises a valuable stable, and praying for an injunction to restrain said Tams from removing the said stable from the premises, and

converting it to his own use. Upon this an injunction was awarded, as prayed f or; and said Tams not heeding the said injunction, a rule was awarded against him to show cause why he should not be attached, &c. To this rule said Tams filed his *sworn answer,* saying that the removal of the stable was "made with the consent and by the authority of Dr. B. B. Donaghe, who was the purchaser, and is the present owner of the property."

On the 26th of November, 1866, an amended bill was filed in the said cause; and at the January rules, 1867, the said Tams, trustee, filed an elaborate and well-considered answer, under oath, to both the original and amended bills aforesaid, in which he says that he and the other officers of the bank, who were preferred creditors under the deed of trust, were in such pressing need of the means of subsistence, having been turned loose without such means after the war, that he sold this property, as the only available asset of the bank, to satisfy his own and their most exigent needs; that he made the sale of the property on the 18th day of November, 1865, to Dr. B. B. Donaghe, who had since expended thereon between $900 and $1,000 in repairs; that the Virginia Insurance Company, in connection with himself as trustee, is occupying the said building *as tenants of Dr. Donaghe;* that the sale was a *bona fide* one, made in good faith; and he filed a copy of the contract of sale and the evidence of Dr. Donaghe's payments, with his said answer; and he filed also a communication from said Donaghe saying that if the court should think it desirable or proper to set aside the sale to him he would consent to it, upon the terms that the amount of his purchase money, with interest, and the amount expended by him in repairs and improvements, should be refunded to him. After this sworn answer of Tams, trustee, showing that Donaghe was the owner of the property, was filed, the plaintiff, Bickle, who was a

creditor of the Central Bank, never pressed the suit any further, and the case went off the docket under the seven year rule.

About October, 1868, during the pendency of this Bickle suit, charging that the property had been sold by Tams to Donaghe for an inadequate price, said William H. Tams, trustee, made a second deed for the property, to B. B. Donaghe, which was duly recorded in the clerk's office of the husting court of Staunton, Va., reciting therein, as a further consideration paid by said Donaghe for the said property, the surrender of a certain debt held by the said Donaghe against the trust fund. The said debt was of little or no value; but, for whatever it might be worth, he surrendered it as additional consideration to the $5,500 for the property. From this time on, there was never any question as to Dr. Donaghe being the lawful owner of this property—he using and enjoying the rents, paying the taxes, insurance and repairs, until the death of said William H. Tams, in August, 1873. A few days after the death of William H. Tams, Dr. Donaghe received a letter from Mrs. M. A. Tams, the widow (*appellee*), asking him for a receipt for the $7,500 in money paid to him, by her, in her room, for the property. To this letter Dr. Donaghe replied, at once, and emphatically denied that she, M. A. Tams, had ever paid to him, any such sum of money, or other sum, as she alleged, for said property. From and after the receipt of this letter from Mrs. M. A. Tams, Dr. Donaghe consulted and employed able and eminent counsel, Mr. Cochran and Mr. White, to resist the claim of Mrs. M. A. Tams, and to protect him in his own right to the said property.

The evidence in the record shows, that Dr. B. B. Donaghe was a pure and good man, and a skillful physician in large practice; though, an exceedingly careless and inattentive business man, taking little or no care of his business affairs, the management of which he had committed and confided wholly and

absolutely to his intimate friend and agent, William H. Tams. Not long after the receipt of the letter from Mrs. M. A. Tams, as aforesaid, and his prompt reply thereto, Dr. Donaghe, who was the family physician, was summoned to visit Mrs. Tams, professionally. He found her in her private bed chamber, with two of her daughters present (as the evidence shows) expressly *as witnesses*, and with a deed conveying the property to her use, already prepared, which she insisted he should sign ; saying, with great demonstration of intense excitement, that if he did not sign it, she would die, or go crazy, or words to that effect. He, to quiet her, put his name to the paper, saying he would take it home, and get his wife to sign it, and he immediately left the room with the so-called deed, which he took directly home with him, and, explaining to his wife all that had occurred, threw it into the fire, saying, that he never intended to execute or deliver it; that he had no idea of *giving* the property to Mrs. Tams.

The *deed,* which was thus suddenly and unexpectedly sprung upon Dr. Donaghe at this "*chamber scene*" (as it is called in this record), had been prepared by *Judge J. W. G. Smith,* of Staunton, a lawyer of ability and distinction, who was Mrs. Tams' brother, and the trustee of her estate under her father's will, and yet he was not present, nor was any *notary* or witness, other than Mrs. Tams' *two daughters*—one of whom was a child thirteen-and-a-half years of age.

The competency of both these witnesses was objected to, and noted in their depositions upon the ground that they are daughters of Mrs. M. A. Tams and grand-daughters of Judge Daniel Smith, deceased, under whose will they are interested as reversioners in the settlement of the trust fund upon their mother for her life; and because Dr. B. B. Donaghe is dead, they having been parties to the original transaction, which is the subject of controversy as to which they testify.

In September, 1879, Dr. B. B. Donaghe departed this life sud-denly, and in 1880 Messrs. Lushbaugh & Brother filed a creditor's bill in the circuit court of Augusta county, seeking to subject any real estate the said Donaghe might own to the satisfaction of his debts.    This Central Bank house and lot was audited in this suit as the property of the said Donaghe, being listed as such on the tax books made out by the assessor ever since the recordation of his deed for the said property in January, 1867, and along with it, one other piece of real estate of small value, was audited—the last remnants of a large estate owned by said Donaghe.    In this creditor's suit a decree was obtained for a sale, and when said Central Bank house and lot was advertised, by the commissioners for sale, Mrs. M. A. Tams filed her bill, asking that the sale be enjoined (which was done) upon the ground, as stated in her bill, that the property belonged to her; that, on or about the 18th day of November, 1865, she took from a tin box, kept by herself (she being the custodian of the key), *fifty-five hundred dollars of solvent bonds* and other securities belonging to her trust fund, and placed them in the hands of said Donaghe, with the request that he would buy this Central Bank property for her; that the fund thus placed in the hands of said Donaghe by her was derived from the estate of her father—the late Daniel Smith—and, under his will, was her separate trust fund; and that said fund was afterwards supplemented by an interest she received from the estate of her deceased brother—Daniel Smith, Jr.—and that the said fund amounted, November 18th, 1865, to the sum of $14,082.00; that her husband, said William H. Tams, had always managed the said fund for her benefit; that the said Donaghe was the mere holder of the legal title, having bought the property, as stated, for her; and that the court should require the property to be conveyed to a trustee for her benefit.

This is the plaintiff's case, as made in her bill, and, upon this case and the evidence in the record, now to be reviewed, the circuit court rendered the decree appealed from, holding that "the legal and competent evidence in the cause, and especially the evidence in regard to the interview between the plaintiff, M. A. Tams, and B. B. Donaghe, in the chamber of the former, and the evidence of R. G. Mayo, fully establishes the clear and conclusive admission on the part of said B. B. Donaghe that the property in controversy was the property of the said plaintiff; and that there is nothing in the cause, in the opinion of the court, to countervail the effect and force of said admission; and, consequently, the plaintiff is entitled to have the property, in controversy in the cause, conveyed to a trustee for her use for life, with remainder to her children, in accordance with the limitations of trust contained in the will of Daniel Smith, deceased, as to the property devised and bequeathed to the plaintiff."

The case stated in the bill, and the decree of the court, assert a *resulting trust*, which declares null and void the deed made for this Central Bank house and lot by William H. Tams, trustee, to B. B. Donaghe, for value fully paid and acknowledged, and which has been duly recorded for nearly twenty years, and takes it away from the widow and children of B. B. Donaghe, and conveys it by a commissioner of the court to the plaintiff, M. A. Tams.

"A resulting trust is one which arises by operation of law. Thus, if one pays the purchase money of an estate and takes the title-deed in the name of another, in the absence of all evidence of intention, the law presumes a trust, from the natural equity that he who pays the purchase money for property ought to enjoy the beneficial interest. But as a resulting trust is a mere matter of equitable presumption, it may be rebutted by facts which negative the presumption. And what-

ever facts appear tending to prove that it was intended that the nominal purchaser should take the beneficial interest, as well as the legal title, negatives the presumption." Perry on Trusts, p. 137, sec. 139.

"The trust must be clearly alleged in the bill, not only in terms, but all the facts must be set out from which the trust is claimed to result. And the facts, in all cases, must be proved with great clearness and certainty." Perry on Trusts, p. 155, sec. 137.

"The resulting trust not within the statute of frauds, and which may be shown without writing, is when the purchase is made with the proper moneys of the *cestui que trust*, and the deed not taken in his name. The trust results from the original transaction at the time it takes place, and at no other time, and it is founded on the actual payment of money, and on no other ground." (2d Johns Chancery Reports, p. 415, quoted with approbation by Judge Bouldin in *Phelps* v. *Seeley*, and by Judge Christian in *Miller* v. *Blose's Ex'ors*, 30 Gratt., p. 744. See also *Neil* v. *Keese*, 51 Amer. Decis. 746.)

"The cases uniformly show that the courts have been deeply impressed with the danger of *parol proof* as tending to perjury and the insecurity of paper title; and they have consequently required the payment of the *cestui que trust* to be clearly proven. The court has felt the necessity of requiring full and convincing proof of payment as the basis of a resulting trust in favor of the one making it, as against the one having the legal title." (50th Amer. Decis. 620; 51 Amer. Decis. 746.)

"So cautious have the courts been in the reception of such evidence, although the proofs have been allowed to be read, if there was any secret in the cause not understood the relief sought has been denied." (50 American Decis. 620; 51 Idem. 746.)

"All the cases show manifestly a determination in courts not to enlarge, by construction or analogy, the doctrine, in allowing the introduction of parol proof to control the language of the deed." (50 Amer. Decis. 620.)

"There is no doubt that a resulting trust may be set up by parol testimony against the letter of a deed ; but the testimony to produce this result, must in each case, be clear and unquestionable. Vague and indefinite declarations and admissions, long after the fact, have always been regarded as unsatisfactory and insufficient, and, I think, with good reason." (*Phelps* v. *Seeley*, 22 Gratt. 589.)

In the light of these clear and conclusive authorities as to the law of resulting trusts, the question for this court to decide is, "Who paid the purchase money? whose money was paid to William H. Tams, trustee, as the consideration in the deed made to said B. B. Donaghe by said Tams, trustee, conveying this property in controversy to said B. B. Donaghe in absolute and unconditional fee-simple title, in pursuance of the written contract of sale made between them November 18, 1865?"

We have seen that the appellee, Mrs. M. A. Tams, in August, 1873, a few days after the death of her husband, William H. Tams, writes a letter of request to Dr. B. B. Donaghe, that he would send to her a receipt for the $7,500 in money which she alleged she had paid into his hands, in her room, for this house (the Central Bank building), alleging that she told him at the time it was her (my) "own money." To this note Dr. B. B. Donaghe sent promptly a positive and emphatic denial that she had ever paid to him $7,500, or any other sum of money in her room.

This correspondence, which is without date, it appears from Mrs. Tams' note, took place "*one week*" after the death of William H. Tams, in August, 1873.

Yet, notwithstanding this positive denial of her assertion

and refusal of her request, on the 13th of January, 1874, following, Mrs. M. A. Tams writes to Dr. B. B. Donaghe in the following kindly and confidential terms: "My dear friend— I am anxious to settle my husband's business, as he wished it should be, *yours* first of all. When he was in so much distress about Mary B. Kinney, you kindly loaned him $5,000. He did not give his note, hoping to pay it in a very short time. I ought to have given it to you before, but my mind has not been in condition to attend to business of any kind. I do so now, in justice to you, as you have nothing to show his indebtedness to you; and certainly *you* are the last person who should ever lose *one cent* on his account; nothing distressed him more than to see a friend wronged. I have a list of his debts, besides being told, numberless times, *all* about them. He has paid 10 per cent. on this amount up to July 1st, 1873. I send you my note at three years, but will make great effort to pay the principal during this year. * * * * I have been anxious to consult you on several matters, but when the time comes cannot command myself to do so. With a grateful remembrance of all your affection and kindness to my husband, believe me, as ever,      Sincerely your friend,      M. A. Tams."

To this letter Dr. B. B. Donaghe replied:

Staunton, January 22d, 1874.

"Mary A. Tams—My dear friend,—Your letter of the 13th inst. was received, in which you inclose your bond to me for $5,000, dated January 13th, 1874, and payable at three years, in discharge of that amount loaned by me to your husband, to relieve him from his difficulties arising from the result of a suit with Mary B. Kinney. I accept the bond in discharge of that debt. I am having my business matters with Mr. Tams investigated and straightened up as far as practicable, and

when the same is completed, will be ready for a final settlement with you *as his executrix.* Thanking you for your renewed expression of kind feeling,

"I am sincerely your friend,    B. B. DONAGHE."

Dr. B. B. Donaghe died in September, 1879, and in June, 1881, Mrs. M. A. Tams filed her bill in this suit, in which, laying her claim, and stating her case *with particularity,* as to *when, how, with what, and to whom* she had paid the purchase money which she alleged to have paid for this property, stated under oath "that on or about the 18th day of November, 1865, she placed in the hands of the said Briscoe B. Donaghe, *solvent bonds and securities* belonging to her separate estate to the amount of $5,500, with the request that he would purchase, in his own name, but for your oratrix, the house and lot aforesaid ; that said B. B. Donaghe did contract and receive a deed for the said property in his own name, but that the purchase price thereof—to wit, $5,500, was wholly paid with the means of your oratrix, and that not one dollar of the same was paid or advanced by said B. B. Donaghe. As a matter of course *her husband knew and understood that the said B. B. Donaghe was acting for your oratrix; and that the securities transferred to him in payment for the property belonged to your oratrix."* This very case made in the bill of Mrs. Tams is such a case as a court of equity regards with distrust and disfavor. Mr. Tams, her husband, who, by her own positive averment, knew and understood that said B. B. Donaghe was acting for Mrs. Tams, sold at a private sale, for the benefit of his own wife, the property *which he held in trust* as the fiduciary of the broken bank and its creditors.

This is the statement of her case as made in her bill, differing widely, materially, and egregiously, both as to the *amount* and the *character* of payment alleged to have been paid by her

to Dr. B. B. Donaghe in her room in 1865, as stated in her letter addressed to him a few days after her husband's death in August, 1873.

But not only must the plaintiff *state* her case in her bill clearly and with particularity as to when, and how, and with what she paid the purchase money, but the case stated must be supported by full, clear, and convincing proof. *A resulting trust* in favor of a party claiming to be the *cestui que trust*, against the grantee in a clear fee-simple deed of conveyance, can arise only when it shall be established by "*clear and un-questionable*" proof—"*with great clearness and certainty*"—that the party claiming against the deed paid the purchase money, and paid it at the time of the transaction. See Perry on Trusts (*supra*), p. 155, sec. 137 ; *Phelps* v. *Seeley,* 22 Gratt. (*supra*), 589.

The pretension of the appellee, M. A. Tams, to be the equitable owner of the property in controversy, and the decree of the circuit court in favor of her right, rest solely upon the parol evidence of Mrs. Tams' two daughters in regard to the interview between Mrs. M. A. Tams and Dr. B. B. Donaghe in the "*chamber scene,*" and the evidence of R. G. Mayo.

On the 19th day of January, 1884, *Rosalie B. Whittle* was examined as a witness in this case, and she testified as to this chamber scene: " Yes, I was in the room; my sister Fannie and myself were the only persons present besides Dr. Donaghe and my mother. Well, a few days after my father's death, my mother sent for Dr. Donaghe; said she wanted to see him on a matter of business. He came, and in a few minutes after being in the room mother got the deed. Mother said: ' Doctor, here is the deed to my house I want you to sign.' Dr. Donaghe said: ' Does John Green think it best for you to have it now? She said ' Yes.' Then Dr. Donaghe said, 'I will sign it with pleasure; you ought to have had it long ago.' When he got

up to leave he said, 'I will take it in the bank and acknowledge it before Mr. Wayt, and get him to go up and take my wife's acknowledgment, and will bring it back in a few minutes, for my buggy is at the door.' This is all the conversation I remember." On cross-examination she said: "I was thirteen-and-a-half years old; I paid strict attention to the conversation, as I knew on what business Dr. Donaghe was sent for. * * My mother told me she wanted me in the room, as she might want something. She told me to give her a pen and ink, and I kept my ears open while the conversation was going on." She said she did not read the deed, and did not hear it read, and "I only know that my mother said, here is a deed for my house for Dr. Donaghe to sign."

*Fannie L. Tams* testified: "I was present. Dr. Donaghe called at mother's request. She said, Doctor, I want you to sign my deed—a deed to my house. He replied, Does John Green think it best to have it made? She said Yes; and he said, I will sign it with pleasure. After signing it he said I will take it to the bank and acknowledge it before Mr. Wayt, and get him to go up and get Mrs. Donaghe's acknowledgment. I will bring it back in a few minutes. My buggy is at the door. *This is all.*"

On cross-examination she said: " She (my mother) requested me to come in to be there in case it was necessary to do anything for her, *and to be present as a witness.*"

These two daughters of Mrs. M. A. Tams—one of them a mere child at the date of the occurrence—give the details of this "chamber scene," which took place eleven years before, in almost exactly the same words. They both state, with special and guarded emphasis, that they were present by their mother's request *as witnesses.*

Why was this unusual and altogether remarkable course pursued in having a deed executed? Mrs. Tams had a

brother, who was a learned lawyer and an expert business-
man, who was the trustee of her fund, appointed for its man-
agement and protection by the will of her father, the late
Judge Daniel Smith, and this brother lived in the town of
Staunton, at her daily and hourly consultation, and who had
prepared this very paper for her which Dr. Donaghe signed
under the peculiar and embarrassing circumstances in which
he was suddenly placed, and which he took away with him
and destroyed and never delivered. She had her son and
others near to her, and competent to attend to such a business
matter for her in the usual way. Why was not Mr. Wayt,
the notary, in the same building, nor any of these others
referred to, present? Why was Dr. Donaghe (who, as the evi-
dence shows, by advice of his counsel, had persistently kept
aloof and refused constant importunity to see Mrs. Tams on
business, after the reception of her letter demanding a receipt
for $7,500.00 in money, which she alleged she had paid to
him), summoned, as the family physician to the private cham-
ber of Mrs. Tams, there to be unexpectedly confronted with a
deed, already prepared, with no notary present, or other wit-
ness, than her two daughters with their ears open (to use the
language of one of them), for the instructed purpose of catch-
ing every word that was spoken? Does it not prove that Mrs.
Tams well knew that Dr. Donaghe did not admit the claim
she was making to the property, but positively denied it, and
that the design was to get some *admission* from him, under the
peculiar situation, prejudicial to his rights and favorable to
her claim? But what do these witnesses prove? Not one
word of *admission* that Mrs. Tams had paid the purchase
money for the property, or that she had any rightful claim to
it; and nothing—literally nothing—but the act of his signing
*the paper* which was thrust upon him by a female patient, with
importunity and expostulate demand, that if he did not sign

it, she would die or lose her reason, which paper, these witnesses prove, he took away with him.

Fortunately, it will not be necessary to comment further upon the testimony of these two young ladies, except to say (after comparing it with all the *congruities* of the case arising out of Dr. Donaghe's constant, unvaried and contemporary conduct of refusal and resistance to the claim of Mrs. Tams) that it proves nothing but *the fact of the interview* and *the signing of the paper* by Dr. Donaghe, and his taking it away with him from the extraordinary and painful scene.   They do not prove that it was *acknowledged* or *delivered;* and they do prove that this "*is all.*"   It is remarkable that Dr. Donaghe (according to these special witnesses who were there with their ears open to hear and their eyes to see everything that was said and done) should have signed that *deed without reading it,* or being *invited to read it!*   Yet, it is equally to be remarked that if he did sign *that paper* (as the evidence in the record shows) for the purpose of *calming a female patient,* whom he feared would "die or go crazy on his hands," he was provident and sensible enough to *take it away with him and destroy it.*   These young ladies—one of them a mere child—were not disinterested witnesses of that chamber interview; and in testifying eleven years after the occurrence, they may, without intending to do so, totally alter the effect and meaning of what was said, even if they had at the time a full and correct apprehension of every point.

Sir William Grant says, in *Lench* v. *Lench,* 10 Ves.: "*the slightest mistake or failure of recollection may totally alter the effect of the declaration.*"

The evidence of the witness, Mayo, is utterly insufficient to warrant the decree which takes this property away from the appellants and nullifies their solemn, recorded title deed, even if that testimony were credible, consistent, and uncontradicted by the record.   The deposition of this witness, R. G. Mayo, was

taken in Florida November 1, 1881, and without cross-examination.   He says:

"The building in controversy was held by Dr. Donaghe for M. A. Tams, and belonged to her.   I make this statement upon information from the late Dr. Donaghe directly to me.   I have no means of now stating the exact date, but it was some little time after the death of Mr. Tams, and, on the morning of the day following the making of a certain deed, presently to be mentioned, that Dr. Donaghe called upon me in the office I then occupied as cashier of the Virginia Banking and Trust Co.   He appeared much distressed in mind, and, calling me to the back part of the room, opened the conversation by saying, that when he purchased the Old Central Bank building, he did so for Mrs. Tams, and that it belonged to her, that on the previous day he had executed a deed for the same to her, and acknowledged it before Mr. John Wayt, as notary public; that then, upon his request, Mr. Wayt had carried such deed to his wife, Mrs. Donaghe, for the purpose of obtaining her signature and her acknowledgement to it; but that Mrs. Donaghe had declined to sign the deed in view of some missing and unaccounted bonds left by him with Mr. Tams for safe-keeping. *     *     *     In more than one conversation with the late Mr. John Wayt he spoke of this matter to me, making a like statement."

Now, let it be remarked, that, at this speaking, both Dr. B. B. Donaghe and Mr. John Wayt had long been in their graves, and their lips were sealed in death; and that the foregoing statement of the witness embraces no fact or circumstance *capable of being contradicted or investigated.*   Sir William Grant, in the case already cited, of *Lench* v. *Lench,* 10th Ves., p. 513, in speaking of the testimony of a witness, says she swears to no "fact or circumstance capable of being contradicted or investigated; but merely to a *naked declaration* that the purchase was made

with the trust money.    That is, in all cases, most unsatisfactory evidence, on account of the facility with which it may be *fabricated*, and the impossibility of contradicting it.    Besides, the slightest mistake, or failure of recollection, may totally alter the effect of the declaration." See *Borstford* v. *Burr*, Johns. Chancery R. 412, and *Phelps* v. *Seeley* (*supra*), and the numerous leading cases on the subject there referred to.

Chancellor Kent, in *Borstford* v. *Burr*, in commenting upon the parol testimony by which a trust was sought to be engrafted upon a written instrument, says: "This is a remarkable instance of the inaccuracy and fallacy of human testimony, and shows the great danger of giving much latitude to those implied trusts, founded on naked declarations, in opposition to the solemnity and certainty of written documents."

The statement of this witness (Mayo) in regard to this alleged interview with Dr. Donaghe in August, 1873, the next morning after the chamber scene, is utterly inconsistent, not only with Dr. Donaghe's and William H. Tams' uniform, constant and consistent course of action in regard to this property, and Wm. H. Tams' sworn and solemn answers in several suits in the circuit court of Augusta, and in Rockingham county, as proved abundantly in the record, but it is wholly irreconcilable with Mayo's own action and statements as to the ownership of this property.    It is utterly inconceivable—absolutely incredible— that Dr. Donaghe could have sought out Mayo and called him aside and made to him the communication which Mayo states that he did, when, the day before, the same day, and all the time after he had received Mrs. Tams' letter, giving him the first intimation that she claimed the property, he was, as is shown in the record, to his counsel, employed to resist that claim and defend his own right, and to his friends, denying what Mayo says he admitted.    Is it conceivable that Donaghe, soon after he had denied Mrs. Tams' claim, as asserted in her

letter, and the next day after he had destroyed the paper, or
so-called deed, which he took away with him from the cham-
ber scene, and, therefore, after he knew that his title was to
be assailed, would seek out Mayo and make the statement
which Mayo claims that he made, and thereby put his adver-
saries in possession of evidence which would defeat his claim?
or that he would or could have sent his counsel—Meade
Fitzhugh White—to demand of Mayo *why* he was crediting
the rents to Mrs. Tams, when he just told Mayo that the prop-
erty belonged to Mrs. Tams|? The statement transcends the
bounds of reason and all human experience; and, being from
its nature and specifications, "*incapable of investigation, or con-
tradiction by direct proof,*" it must be tested by the standard of
probability and experience. The evidence of Mrs. Tams'
brother and trustee—Judge J. W. G. Smith—is that Donaghe
had denied Mrs. Tams' right, and asserted his own, up to the
day of the chamber scene; and the evidence of George M.
Cochran, Esq., and Meade F. White, Esq., is that he denied
Mrs. Tams' right and asserted his own, without variation
from the reception of Mrs. Tams' letter in 1873, to the day
of his death in 1879.

But Mayo's own statement to Mr. White, who went to him
shortly after this alleged interview with Donaghe, and de-
manded of him to know why he (Mayo) had stopped crediting
Dr. Donaghe with the *rents* for this property, which William
H. Tams, his predecessor, as cashier, had regularly and with-
out fail credited to Dr. Donaghe upon the books of the bank
from the day of sale—November 18th, 1865—to his death in
1873, was that *Mrs. Tams had told him to do so,* and he believed
it was all right. And in answer to Mr. White's direct demand
to know if Dr. Donaghe knew of his action in the matter, he said
*not that he knew of.* Is it not strange, passing strange, that he
did not *then* say to Mr. White, Dr. Donaghe's counsel, *why*

*Dr. Donaghe told me, only a few days ago, that it was Mrs. Tams'*
*property; and for this reason,* and at her request, I credit her
with the rents? But no word or allusion then to the *alleged*
*interview,* perhaps for the reason that Dr. Donaghe was then in
life and health, and not until Dr. Donaghe was dead was it
ever heard of, though the said rents for the property were
credited to Donaghe thenceforward to his death, and asserted
for his estate after his death.

But this witness, Mayo, testified pointedly and particularly
to sundry other essential and material allegations in his depo-
sition, as to every one of which explicit statements he is abso-
lutely and flatly contradicted by the facts in the record. He
states in his answer to the fourth question in his deposition
that " neither said *insurance* nor premiums, nor *taxes* were either
in whole or in part charged to or accounted for by Dr. B. B.
Donaghe." It appears from Dr. Donaghe's bank account that
both the insurance and taxes were regularly charged to him
on that account, and accounted for by him.

He states: " Mr. Tams, as agent of the Continental Fire Insu-
rance Company of New York, insured said building in his own
name, paying the premium himself, and I, as his successor as
such agent, insured it in the name of Mrs. M. A. Tams, charg-
ing the premiums to her." The books of the bank (as shown
in the evidence) show that Mr. Tams did not pay the insu-
rance, but charged every dollar of it to Dr. Donaghe during his
(Tams') lifetime ; and if it was insured by Mayo for the bene-
fit of Mrs. Tams, and the premiums charged to her, it could
have been shown, as she kept her accounts in that bank as
long as it existed.

He states that no claim was asserted for rent by or in behalf
of Donaghe, when it is proven by the evidence of Mr. White
that, upon learning from Major Bell, the president of the bank,
when he was settling Dr. Donaghe's over-draft with the bank,

that Mayo was then crediting Mrs. Tams by the rent; that he, as counsel for Donaghe, at once denied his authority to do so, and went at once to Mayo and demanded to know by what authority he had made the *attornment*, and if Dr. Donaghe had directed, sanctioned, or was privy to it; and that Mayo stated to him that he had done it upon the demand of Mrs. Tams, and believing it was all right; that in answer to the direct question whether Dr. Donaghe had directed or knew of it, he replied, "*not so far as* he knew."

Thus it is proven by the record that every material fact stated in Mayo's deposition is contradicted by the evidence except his statement about Donaghe's alleged admission in the interview with him (Mayo), which is incapable of being expressly contradicted by proof, because it is located at a time when no one but Mayo and Donaghe are alleged to have been present, and *Donaghe is dead.* The maxim, "*falsus in uno falsus in omnibus*" may be inverted and applied to the evidence of this witness, Mayo, that, being proved mistaken or false in all his other material statements in his deposition, we may conclude that he is false or mistaken as to the alleged interview and the admissions imputed to Donaghe.

Again, it may be asked, why did Mayo never mention or allude to this alleged interview and statement imputed to Donaghe in 1873, until after his death in 1879, although there were (as the record shows) repeated opportunities and occasions of duty for his doing so, arising out of this very rent account with Donaghe, upon the books of the bank kept by Mayo? Why did Mrs. Tams never, from the date of the sale of this property by Wm. H. Tams to Dr. Donaghe, November 18, 1865, up to the death of said Tams, her husband, in August, 1873, ask for a receipt from Donaghe, or intimate in any way to him or to any one, that she had paid for this property, and that Donaghe had bought it with her money, and for her?

Why, above all, did she not sue Donaghe in all the time between the death of William H. Tams, in 1873, and the death of Dr. Donaghe, in 1879, and not, indeed, until November, 1881?

Another witness, *William P. Tams,* a son of the plaintiff, who was a lad of fourteen years at the date of the purchase of this Central Bank property by Dr. Donaghe from his father, Wm. H. Tams, trustee, endeavors to prove, by an array of figures and calculations based upon error, that Dr. Donaghe did not possess, nor could command, the means necessary to buy and pay for this property in November, 1865; but the evidence in the record aboundingly and indisputably proves that Dr. Donaghe was at that time a wealthy man, and exceptionally able to buy and pay for it; that he did buy and pay for it in instalments credited upon the written executory contract in the handwriting and keeping of William H. Tams, who made and delivered to him a deed for it, in fee-simple and absolute right, which he placed upon the records of Augusta county court; that he took possession of the property and expended upon it about $1,000 in immediate repairs; that he rented the property out to William H. Tams, and to the various banking concerns of which said Tams was, to his death, the managing head and cashier, all of whom were his tenants, and paid to him regularly his rents up to his death, amounting to thousands of dollars; that he paid the taxes and insurance upon the property, and exercised full and unquestioned ownership of the property as long as he lived, from the day of its purchase—fourteen years.

Mrs. Tams alleges, in the case made by her bill, that the solvent bonds and other securities (which she says she took from the tin box which, with the key thereof, was in her custody, and gave to Dr. Donaghe to pay for this house and lot for her, amounting to $5,500, November 18th, 1865), constituted

a part of her trust property derived from her father's estate under his will. The inquiry naturally arises, how these *bonds* and *securities* were available as *cash* or *money* to pay to William H. Tams, trustee, for the property, which he says in his written contract, and has sworn over and over again, in this record, he was compelled to sell *for money*, and which he did sell *for money* to Dr. B. B. Donaghe, to supply the means of living for himself and family, and to the other officers of the bank who were, like him, in dire necessity?

But the evidence incontrovertibly shows that her trust fund, derived from her father's will, was not *in existence*, or available, at the date of the purchase of this property by Donaghe from Tams, November 18th, 1865. The evidence of her brother and trustee—Judge J. W. G. Smith—shows that the *corpus* of that fund consisted of $2,700.00, proceeds of the sale of a house and lot in Harrisonburg, Va., and the entire residue of the fund was represented by the bond of her husband—William H. Tams—with his father, William Tams, as security, for the sum of $3,884.00, executed to J. W. G. Smith as her trustee, and *still held by said trustee and filed with his deposition* in this suit. The said $2,700.00 is shown by the evidence to have been invested under the decrees of the circuit court of Rockingham county by E. T. H. Warren, commissioner, in stock of the Central Bank of Virginia, and to have remained so invested up to the failure and suspension of said bank in August, 1865, *when said stock perished.* And it appears fully and distinctly that in the only instance in which Mrs. Tams attempted to *designate* a single security taken by her from the said tin box, and with which she claims to have paid for this property, it is shown by overwhelming evidence that she did not own or possess at the time, or since, any such bond or security, which had been long before this sale transferred to other parties. And it does appear conclusively by the evi-

dence in this record that after the sale of this property by Tams, trustee, to Dr. Donaghe, he (the said Tams) did undertake to reinstate to his wife her said trust fund; and to this end he did by deed, dated August 8th, 1866, convey to J. W. Green Smith, executor of Daniel Smith, deceased, and as such trustee of M. A. Tams, for the benefit of said M. A. Tams, a certain property on the northern suburbs of the city of Staunton, known as "*Sunny Side*," for the consideration stated in the deed—$7,800—which is more than the trust fund originally amounted to. This proved to be a very valuable property, from which Mrs. Tams realized a large sum—over $15,000.

We will not pursue this most painful and protracted investigation any further, except to say, to sustain the case made in the bill would inevitably implicate that William H. Tams and Briscoe B. Donaghe were guilty of systematic and gross fraud in the sale of this property, of falsehood and deceit in the use and occupation of it through a long series of years, and that said William H. Tams swore falsely in his answers filed in the Bickle suit, attacking the integrity of the sale to Donaghe and the sufficiency of the price; and was guilty of making false entries and mutilating the bank accounts kept and made by him, as the cashier of the bank and the trustee of its assets and for its creditors.

The evidence shows, that Briscoe B. Donaghe and William H. Tams lived and died without reproach, and left to their respective families, that better inheritance than great riches, *a good name;* and justice, to *the living* and *the dead*, forbids the cruel ascription, of the fraud and double-dealing dishonor predicated of these good men, by the assertion and argument of this suit.

It is not necessary to notice the other assignments of error; since our conclusion is, that the decree of the circuit court

appealed from is erroneous; and that the bill of complainant ought to have been dismissed, and the injunction dissolved. It will be so ordered. ·

LEWIS P. and LACY J., dissented.

DECREE REVERSED.