## �export𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

### KANE v. O'CONNERS.

December 6th, 1883.

RESULTING TRUSTS—*Parol evidence.*—Where one with another's money buys an estate and takes the conveyance in his own name, by presumption of law a trust results in favor of him whose money is thus used. Such trust may be established by parol proof, but the proof must be clear.

Appeal from decree of chancery court of city of Richmond, rendered 11th June, 1881, in a cause wherein John Kane is plaintiff and John O'Conners is defendant. The decree dismissed the plaintiff's bill, and he obtained an appeal to this court.

Opinion states the case.

*Witt & Caskie* and *Christian & Christian*, for the appellant.

*J. V. Reddy*, for the appellee.

LEWIS, P., delivered the opinion of the court.

It is a familiar and long established rule in equity, that if one person buys an estate with the money of another, and takes the conveyance in his own name, a trust results by presumption of law in favor of him with whose money the purchase was made. And in such cases the trust may be established by parol proof; but, to guard against the

danger of perjury, and for the security of titles, the proof is required to be clear and distinct. Sudgen on Vendors, 443; *Bank of the U. S.* v. *Carrington et als.*, 7 Leigh, 566; *Boyd* v. *McLean,* 1 Johns. Ch'y Rep. 584; *Botsford* v. *Burr,* 2 Id. 404; *Phelps* v. *Seely,* 22 Gratt. 573; *Borst* v. *Nalle,* 28 Id. 423; *Miller* v. *Blose,* 30 Id. 745.

These principles being undisputed, the only question here is, whether the case of the appellant, who was the plaintiff in the court below, is established by the proofs in the record.

The bill alleges that by agreement between the parties the house and lot in controversy was purchased by the defendant and paid for, except as to the sum of $65, with money furnished for the purpose by the plaintiff; that the defendant proposed to take, and did take, the deed in his own name, and to pay rent to the plaintiff, and to convey the property to him whenever required to do so; that being an ignorant man, and having confidence in the defendant's integrity, the plaintiff acceded to the proposition, and the purchase was made. And the prayer of the bill is, that the defendant be required to convey to the petitioner the property in question.

The answer denies the allegations of the bill, and in support thereof the depositions of five witnesses, including his own, were taken by the plaintiff. He himself testifies that the purchase was made at the instance of the defendant and his wife, who was the plaintiff's aunt, and with whom he was living at the time. He further says: "The defendant told me the rent would be raised the next month for the house we were living at, and that he would just as soon pay rent to me as to anyone else; that if I bought the house, I could sell it at any time and get my money back. I then told my aunt, who was keeping my money for me, to get it, and I then gave $200 to O'Conners, the defendant, who took it and made the purchase." He also testifies that

he furnished the defendant at different times various sums of money, amounting in the aggregate to $670, with which to pay for the house, and that the defendant and himself have occupied the house since its purchase; that he has paid a part of the taxes and insurance, but that the defendant has paid no rent. Upon cross-examination, he testified that he paid the defendant board before the house was bought, and offered to pay board afterwards, but that the defendant refused to take it, saying that he was unable to pay rent, and would take no board. He further testified, that after his marriage, which occurred some time after the purchase, he ceased to board with the defendant, and occupied the upper part of the house with his wife, the defendant occupying the lower part, and that no demand for rent has ever been made upon him by the defendant.

The witness, Gilliam, who owns the adjoining lot to the one in controversy, testifies that on one occasion, when a line fence was being put up between the two lots, the defendant complained to the carpenter that he was putting the fence too much on his side, and that the witness said to him the fence was on the right line, and that the defendant thereupon remarked that he did not care; that the house was John Kane's, and that Kane objected to the fence being put where the carpenter was putting it.

Mrs. Margaret Gilliam testifies that on the day the third instalment on the house was due, she went into the defendant's house, and found him and his wife and the plaintiff's wife counting out the money with which to make the payment; that after the witness entered, the plaintiff's wife went up stairs to her room and brought down more money and gave it to the defendant; that she, the witness, and the defendant left the house together to deposit the money in bank, and that when they arrived at the bank, he handed her the money to count, which she did, and found that the package contained the amount due that day—namely,

$185.50; that on their return home, she inquired of the defendant who owned the house, and he replied that, "with the help of God, it was going to be John Kane's house, for it was the poor fellow's money that was paying for it."

Dr. Geo. Ben. Johnston testifies that on one occasion he had a conversation with the defendant, in which he inquired of him whether the house in which he lived was his or Kane's; and that he replied it was Kane's. And in reply to a further question, why he did not make the house over to Kane, he said that if he did so, Kane would turn him out; that he kept the papers in his own name in order that he might keep a home. When asked by counsel to state why he spoke to the defendant on the subject, the witness replied: "Because I had had former conversations with Kane and his wife, who were my patients, and both of them had told me that O'Conners was keeping them out of the ownership of the property. I found Kane in a great state of mental depression, which was the essence of his sickness, and the cause of this depression I descovered to be his controversy with O'Conners. I suggested to him several times to arrange this affair with O'Conners, and get it off his mind. He said that he had made several efforts to do so. It was with the desire to get at the facts of the case that I asked O'Conners the questions I did." And in reply to further questions the witness stated that he had had excellent opportunities of knowing the plaintiff, and that he was a very ignorant man.

The witness, Father Janssens, a Catholic priest, and of whose church both the plaintiff and the defendant were members, testifies as follows: "I spoke to O'Conners of the injustice of sending Kane out of the house, merely because he had a legal title on his side. I mentioned to him that Kane had told me that he had paid about $600 and O'Conners about $70 of the purchase money, and this O'Conners never denied."

Such, substantially, is the evidence for the plaintiff. And here we have, in addition to his own positive testimony as to the agreement between the parties and the payment of the purchase money by him, the admissions of the defendant, not vague and indefinite, but distinct and unequivocal, to the same effect. In opposition to this testimony is the answer of the defendant and the depositions of several witnesses, taken with a view to discredit the statements of two of the plaintiff's witnesses, and to show the pecuniary ability on the part of the defendant to buy the property with his own money.

Without stopping, however, to further review the evidence, it is sufficient to say that we have examined it carefully, and are forced to conclude that the case of the plaintiff is established with sufficient clearness and certainty to entitle him to the relief for which he prays. It does not appear—indeed, it is not claimed—that he has paid the whole of the purchase money, but it does appear that it was wholly advanced by him except as to the sum of $65 or $70. Under these circumstances, therefore, he would be entitled in any event to a charge on the property to the extent of the purchase money so advanced. *Botsford* v. *Burr, supra; Morey* v. *Herrick*, 18 Penn. St. 129. But as it appears that at the time the last payment was made, the defendant was indebted to the plaintiff on account of the use and occupation of the property in a sum exceeding $70, and which remains unpaid, there is no reason why, in a court of equity, the whole of the purchase money should not be regarded as paid by the plaintiff, and a decree entered accordingly.

The property was bought in 1871, and the suit was brought in 1880. It was not until several years after the purchase that the defendant asserted an adverse claim to the property, and there is nothing to show *laches* or unreasonable delay on the part of the plaintiff in asserting his rights. The decree of the chancery court must, there-

fore, be reversed, and a decree entered here in accordance with the prayer of the bill.

The decree was as follows :

This day came again the parties by counsel, and the court, having maturely considered the transcript of the record of the decree aforesaid and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the said decree is erroneous. Therefore, it is considered by the court that the same be reversed and annulled, and that the appellee pay to the appellant his costs by him expended in the prosecution of his appeal aforesaid here. And this court proceeding to render such decree as the said chancery court ought to have rendered, and it appearing to the court that the whole of the purchase money for the house and lot in the bill and proceedings mentioned has been advanced by the appellant, except as to the sum of seventy dollars, and that, at the time the last instalment of the purchase money was paid, the appellee was justly indebted to the appellant in at least that sum for rent due on the property in question, and which remains unpaid, and which, by being credited to the appellee, ought to be treated as paid by the appellant in full discharge of the purchase money, it is further adjudged, ordered and decreed that the appellee do forthwith convey to the appellant, by a good and sufficient deed, with special warranty of title, the house and lot aforesaid, and that he also pay to him his costs by him expended in the said chancery court; which is ordered to be certified to the said chancery court of the city of Richmond.

DECREE REVERSED.