# 𝔖𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## LEATH v. WATSON ET ALS.

### March 9th, 1893.

1. RESULTING TRUST—*Allegata—Probata—Case at bar.*—To establish a resulting trust by parol testimony, to over-ride a deed absolute on its face, the property must be described with particularity in the pleadings, and the evidence must be clear, full, and satisfactory, and must correspond with the allegations.

HELD:

> In the suit here the evidence is in substantial conformity with the bill, and establishes the trust claimed by the plaintiff.

2. IDEM—*Fraud—Case at bar.*—Where, in the pleadings, no charge of fraud is made, evidence is inadmissible to show that the arrangement made, whereby land conveyed absolutely to a third party was to be paid for with plaintiff's money, and held in trust for her, was made fraudulently, with a view to hinder, delay, and defraud plaintiff's creditors—

HELD:

> In the case here there is no such charge made, and, if made, no evidence to sustain it.

Appeal from decree of circuit court of Nottoway county, rendered September 19th, 1891, in a suit in equity wherein Margaret A. Leath and Joseph E. Leath, her husband, the appellants here, were plaintiffs, and Meredith Watson and others were defendants. Opinion states the case.

*George J. Hundley,* for appellants.

*J. P. Fitzgerald,* for appellees.

LEWIS, P., delivered the opinion of the court.

Opinion.

The bill was filed by Mrs. Leath, in which her husband, Joseph E. Leath, was joined with her, praying, among other things, for an injunction. The bill states that shortly before the commencement of the suit two actions of ejectment were instituted in the same court by the defendant, Watson—one jointly against Mrs. Leath and her husband, to recover possession of certain premises upon which they reside, in the town of Burkeville ; the other against Joseph E. Leath, to recover a tract of 170 acres of land, situate in the same county. The prosecution of these actions is sought to be enjoined, and upon the filing of the bill an injunction was awarded.

There is little or no dispute as to the first-mentioned property. It is conceded that Watson purchased it at a judicial sale, in November, 1879, to satisfy certain debts of Joseph E. Leath. It is also conceded that Watson purchased it under an agreement with Mrs. Leath to convey it to her upon her paying to him the amount of the purchase-money, with interest and costs ; which agreement he prays in the answer may be specifically enforced. At the time of this agreement Watson and the Leaths were close friends, and the object of the arrangement was to save the property as a home for Mrs. Leath, where she and her husband had for some time previously resided. Joseph E. Leath was heavily indebted, and insolvent. Mrs. Leath was also considerably indebted, although, according to the evidence, she had property in Pennsylvania more than sufficient to pay all her debts, of which, it seems, Watson had been informed.

The main controversy is as to the 170-acre tract, known as " The Camp " tract. This land is described in the bill, as it is in the declaration in ejectment, as " containing 170 acres, situated near the line of the Norfolk and Western railroad, between Burkeville and Nottoway C. H., known as lot No. 4 in a survey of the lands of which Joseph Sampson died seized and possessed, filed in the suit of *Sampson* v. *Sampson* with

the report of Commissioners Kies, Bardwell, and Reese."
This land was sold under a decree in the suit just mentioned,
several months before the Burkeville property was sold.
There was upon it a quantity of timber, suitable for cord
wood, and Mrs. Leath wished to purchase it to give employ-
ment to her husband, in the hope of realizing a profit from
the sale of the wood.

The bill states that Watson was aware of the financial
embarrassment of the Leaths, and that he verbally agreed to
buy the land at the commissioners' sale, and to hold the legal
title as a trustee for Mrs. Leath. It also states that after-
wards, in August, 1879, Mrs. Leath received from Pennsyl-
vania a check, payable to her own order, for $616, which she
endorsed, and (by her husband as her agent) delivered to
Watson, in pursuance of a previous understanding with him.
The proceeds of this check, which Watson collected, were
more than sufficient to pay for the land, although she was not
aware of it at the time. This was before the conveyance to
Watson was made.

He denies, however, both in his answer and deposition,
that there was any agreement between Mrs. Leath and him-
self in regard to this land, and says that after he purchased
it he put Joseph E. Leath in possession, with the under-
standing that he (Leath) would cut and sell the cord wood,
and out of the proceeds, after paying any advances made by
Watson for cutting the wood, to pay for the land at $4 per
acre.

On the other hand, Mrs. Leath testifies in accordance with
the allegations of the bill, and her testimony is clear and
consistent throughout ; whilst in several important particulars
Watson contradicts himself. The circumstances of the case,
moreover, support her version of the matter.

In the first place, there is no doubt that the utter in-
solvency of Leath was well known to Watson. The latter

himself, was a judgment creditor of Leath, and the trustee, in other matters, of Mrs. Leath. They had long been intimate friends and neighbors, and the fact that Mrs. Leath owned considerable property in Pennsylvania was known to him. It was certainly known to his counsel, Judge Mann, who also testifies that it would have been impossible for Leath to have held property, because of numerous unsatisfied judgments against him.

Watson, however, denies that he knew Mrs. Leath in the transaction, and was not aware that she desired to purchase the property. But there is filed with the record a letter to him from Mrs. Leath, written several months before the land was sold, in which she spoke of the land, told him of the efforts she was then making to raise money from her Pennsylvania property, and assured him he would run no risk in buying the land. The meaning of this letter is unmistakable, and, apart from her positive statements as a witness that the matter was perfectly understood between them, negatives Watson's statement that he was ignorant of her desire to acquire the property. It also appears that Judge Mann, as her agent, visited Pennsylvania shortly before Watson purchased the land, for the purpose of raising money to enable her to buy it, and that the check for $616 was the result of his mission. And Watson admits he knew at the time the object of Judge Mann's visit was to raise money, but says he was not aware the money was to be used for that purpose.

Leath was not a competent witness, and his mouth is closed; but we cannot doubt, from what appears in the record, that when he delivered the check to Watson the latter knew it was to pay for the land. He says in his answer he gave Leath credit for it, " as his own property "—*i. e.*, as he explains, he paid a debt to G. H. Southall, upon which he was Leath's surety; but it was not until he afterwards came to be cross-

examined as a witness that he says he so applied the money at Leath's direction. This, however, is not borne out by the record. The Southall debt was not paid for several years afterwards, whilst it does appear that very soon after the check went to Watson's credit in bank he paid the commis- sioner for the land, and the circumstances all point to the fact that the payment was made out of the proceeds of the check.

It appears, moreover, that the Leaths have been in posses- sion of the land from the time of its purchase by Watson, in 1879, until the present time. They have in the meantime improved it, and have received the rents and profits; of all which Watson was aware; yet he has asserted no claim to the land until the institution of the action of ejectment, which was just before the commencement of the present suit. In his deposition he states that for a part of the time, after the purchase of the land, he rented it to one Epps, a colored man; but the latter swears positively he rented it from Leath, and paid Leath the rent, thus flatly contradicting Watson.

Besides these, there are other circumstances tending to sustain the appellants' contention, but it is unnecessary to go more fully into this branch of the case.

It is contended, however, in support of the decree, that there is a fatal variance between the *allegata* and the *probata* in regard to the subject of the alleged trust. But this posi- tion, also, is untenable. The general rule, undoubtedly, is that to establish a resulting trust by parol testimony, to over- ride a deed absolute on its face, the property must be described with particularity in the pleadings, and that the proof must correspond with such description; nor is it disputed that the evidence to establish the trust must be clear, full, and satisfac- tory. 1 Lead. Cas. Eq. (4th ed.) 349, notes to *Dyer* v. *Dyer;* *Miller* v. *Blose,* 30 Gratt. 744; *Kane* v. *O'Conners,* 78 Va. 76. How the land in the present case is described in the bill has been already stated—viz., as containing 170 acres. In

the evidence it is spoken of as " The Camp " or Sampson tract. This, however, if a variance at all, is an immaterial one. The evidence shows that the 170 acres was a part of a tract of upwards of 400 acres, which was owned by the heirs of James Sampson, deceased. Mrs. Leath desired to purchase the whole tract, but, for reasons unnecessary to mention in detail, Watson purchased only two sevenths, and the 170 acres were subsequently allotted to him on account of his purchase. The evidence is, therefore, in substantial conformity with the bill.

Another point made by the appellee is that the alleged trust is not enforceable, because the object in creating it was to hinder and defraud creditors. As to this it is enough to say that no such point is made in the answer or shown by the evidence. Indeed, there was no attempt to prove fraud. It is obvious, moreover, that Mrs. Leath's object was, not to defraud her creditors, but to gain time to raise the necessary means from her Pennsylvania property to pay her indebtedness, which she afterwards did.

It follows that the decree dismissing the bill must be reversed; and an order will be 'entered here reinstating the injunction, and remanding the cause for further proceedings not inconsistent with this opinion.

DECREE REVERSED.