## In re HENDERSON.

### HENDERSON v. HENRIE et al.

(District Court, N. D. West Virginia. November 16, 1905.)

1. TRUSTS—EXPRESS TRUSTS—RESULTING TRUST—PAROL CREATION AND PROOF.

Under the statute of frauds of West Virginia, as construed by its highest court,.both express and constructive trusts in lands made before their purchase, or which are held under an executory contract of purchase, can be created, declared, and proven by parol.

[Ed. Note—For cases in point, see vol. 47, Cent. Dig. Trusts, §§ 18–22, 62–65, 130–133, 159.]

2. SAME—PURCHASE AT JUDICIAL SALE—PAROL AGREEMENT CREATING TRUST.

Prior to a public sale of lands by a trustee in bankruptcy it was orally agreed between petitioner and defendant that the latter should bid in a certain tract and that petitioner should take and pay for a certain portion of it. After it had been so bid off, the exact quantity of the portion to be taken by petitioner being unknown, it was further orally agreed that defendant should pay the purchase price for the whole tract, which he did, and that petitioner should repay him the proportion due on his part as soon as it could be surveyed. Before a conveyance had been made to defendant he refused to recognize the agreement, and petitioner applied to the court of bankruptcy to restrain conveyance to defendant, and praying for the enforcement of the agreement and the conveyance to him of the portion to which he was entitled thereunder. *Held*, that under the law of West Virginia, by which the question was governed, the agreement was valid and enforceable, being clearly proven.

3. BANKRUPTCY—JURISDICTION OF COURT—CONTROVERSY BETWEEN PURCHASERS OF PROPERTY.

  A court of bankruptcy has jurisdiction of a controversy between persons, each claiming the right to a conveyance of lands as purchaser from a trustee in bankruptcy, since, while the title remains in the trustee, its jurisdiction with respect to such lands is exclusive.

In Bankruptcy. On petition of Jock B. Henderson against James M. Henrie and others.

V. B. Archer, for petitioner.
McCluer & McCluer, for respondents.

DAYTON, District Judge. On July 18, 1905, Jock B. Henderson filed his petition in this cause against James M. Henrie and the Union Trust & Deposit Company, trustee for the bankrupt, in which he alleges that at a sale made by said trustee of the real estate of said bankrupt on May 25, 1905, a tract of 62 acres, comprising three lots, numbered 1, 2, and 3, was sold together to Henrie, and by agreement with Henrie before sale he (Henderson) was to have a certain portion of lot one, and the residue of lots were to be Henrie's; that, when they came to settle with the trustee, Henrie agreed the parcel off lot 1 should be surveyed to determine its quantity, he (Henderson) should pay his proportion of purchase money, and the trustee should convey it to him; that Henrie is now insisting upon conveyance of whole to him, denying his (Henderson's) right to the parcel; that this parcel is of peculiar value to him, because of its relative position to his other lands—he praying an order restraining conveyance of legal title to Henrie of said parcel and asking enforcement of the verbal agreement in relation thereto. Such restraining order was immediately granted, and the matter referred to Referee Geo. W. Johnson to ascertain and report the facts. The defendant appeared before referee on July 24, 1905, and filed a demurrer, a formal plea of the statute of frauds, and his answer to this petition. The answer is substantially a denial of the facts as set forth in the petition. The referee returned his findings of fact and all the evidence, and the matter is now before me for determination.

The statute of frauds enacted by the Legislature of this state constitutes a series of rules which determine and regulate primary rights of property and contract, and therefore are a part of the substantive law of the state, in the construction of which the federal courts will follow the rulings of the court of last resort of the state. The statute of frauds as now contained in chapter 98, Code of West Virginia, 1899, had its origin in the English statute of 29 Car. II, c. 3, which, being subsequent to St. 4 Jac. I, was never in force in Virginia. The first enactment of such statute in Virginia was on November 30, 1785, in these words:

  "That no action shall be brought whereby to charge any executor or administrator upon any special promise to answer any debt or damages out of his own estate, or whereby to charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person, or to charge any person upon any agreement made upon consideration of marriage, or upon any contract for the sale of lands, tenements, or hereditaments, or the making any lease thereof for longer term than one year, or upon any agreement which is not to be performed within the space of one year from the making thereof,

unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized."

This old statute, with the addition of the two first clauses relating to liability for credit extended upon representations and the ratification of promises made in infancy, is substantially the statute of the state today.

In the English statute the seventh, eighth, and ninth sections provided that:

"(7) All declarations or creations of trusts, or confidences in any lands, tenements, or hereditaments, shall be manifested and proved by some writing signed by the party who is by law enabled to declare the trust, or by his last will in writing, or else they shall be utterly void.

"(8) Provided always that where any conveyance shall be made of any lands or tenements by which a trust or confidence shall or may arise or result by the implication or construction of law, or be transferred or extinguished by an act or operation of law, then and in every such case such trust or confidence shall be of like force as the same would have been if this statute had not been made, anything hereinbefore to the contrary notwithstanding.

"(9) All grants or assignments of any trust or confidence shall likewise be in writing, signed by the party granting or assigning the same, or by such last will or devise, or else shall likewise be utterly void and of none effect."

It is vital to observe at the beginning that these three sections of the English statute never were adopted, but wholly omitted in the statute and its various re-enactments in Virginia up to the division of the state, and in West Virginia since such division. The seventh section, the important one in this controversy, has been so omitted only so far as I can discover in the statutes of the states of Texas, North Carolina, Tennessee, Virginia, West Virginia, Connecticut, Delaware, Indiana, Ohio, and in Pennsylvania prior to 1856, when it was there enacted. Therefore authorities from other states than these can hardly be even persuasive, based as they are upon statutory provision which we do not have. Perry on Trusts (4th Ed.) §§ 78, 79, and notes.

It is an interesting study to follow what may be called the evolution of the doctrine of trust by parol in lands after the passage of the statute of frauds, as shown by the decisions of Virginia and West Virginia. The first case arising was Buck & Brander v. Copland, 2 Call, 218, decided in 1800, and the second was that of Rowton v. Rowton, 1 Hen. & M. 92, decided in 1806. In that case a father had induced his son to return to the home neighborhood, settle and make improvements upon a tract of land, which he declared to him by parol he had willed him and would never take away from him. The son did live upon the land and improve it until his death, when his widow, setting up title in him in fee simple, brought suit to assert her dower therein. This suit was defended by a denial of the verbal agreement and a reliance upon the statute of frauds. The case was argued by Wickham & Call on one side and Randolph upon the other, and all the judges expressed opinions. Judge Tucker held, with the court below, for the widow, because the father "had betrayed his son into expense in removing to and improving the place; an expense probably little suited to his circumstances, and which he never would have incurred but for his father's proposal and promise." And this he held "takes the case completely out of the operation of the

statute of frauds, which certainly was not meant or intended to countenance or encourage fraud in one from whom the contract first moved." Judge Roane very positively held:

"In no case which ever occurred before me was the policy and utility of the statute of frauds made more manifest."

Judge Fleming regarded it as "a very striking case, evincing the wisdom, propriety, and good policy of the statute of frauds and perjuries, which ought not to be disregarded and overleaped by courts of equity upon such slight and trivial grounds." Judge Carrington regarded it as "a premeditated fraud on an unfortunate woman. She was induced to leave her parents and connections in a distant country, to come hither with her husband, upon a fair prospect that in case of his death she would have at least an establishment for life. But how was she disappointed! The violent hand of the murderer deprived her of her husband, the ruffian hand of a cruel father-in-law ousted her from the land of that husband, and thus she is abandoned to want and distress amongst inhospitable strangers. A greater fraud is seldom perpetrated." On the other hand, Judge Lyons thought the suit "an after-thought of the widow" brought "to tease and vex old Rowton," and "perhaps from private pique or animosity, because she well knew she had no good grounds for the suit," and he regards the case against her so clear that he has no doubt about it, "exclusive of the statute of frauds, but should dismiss the claim as groundless and fraudulent." Counting the chancellor, who decided the case below, we find an "even split" in the views of six of these old judges in such positive terms as not to present a hopeful outlook for the establishment of "peace and harmony" touching this doctrine.

In 1808 the case of Argenbright v. Campbell and Wife, 3 Hen. & M. 144, was decided. In this case John Campbell had promised to James "that if he married his daughter Rebecca" he should have the land in controversy according to the terms of his will. After the marriage, the son-in-law being informed by the attorney that old John Campbell could revoke or change his will at any time, secured from him a bond setting forth the marriage, the promise of land in consequence, the making of the will, and bound him not to revoke or change said will so far as it related to the disposition so made therein of the land. Afterwards John Campbell sold the land to Argenbright, and thereupon James Campbell and wife brought the suit to recover it. Here an exhaustive consideration was had. Judge Tucker, devoting 26 pages to reason and argument, reached the conclusion that the statute of frauds prevented recovery and "upon the whole there never was a case less entitled to the favor, support, or countenance of a court of equity." To this view Judges Roane and Fleming sharply and pointedly dissented, and it was therefore held that:

"A parol promise by a father to his daughter's husband before the marriage is a sufficient consideration to sustain a written agreement made after the marriage, if such written agreement be otherwise sufficient under the statute of frauds."

The next case of importance, decided in 1810, cited by counsel for defendant, was that of Henderson v. Hudson, 1 Munf. 510, in which Hudson sought to compel Henderson to convey to him a moiety of a tract of land which he claimed Henderson had bought under express verbal agreement to "let him in on" as equal partner. In this case Judge Roane did not sit, and Judges Tucker and Fleming agreed that the statute of frauds constituted a bar and the chancellor below must be reversed. Judge Tucker joined in Lord Kenyon's lament "that exceptions were ever introduced in construing the statute of frauds," and Judge Fleming pronounced it "a very beneficial and salutary law." The case, in view of modern decisions, is very instructive because of the arguments made by Peyton Randolph and William Wirt, illustrating the insuperable objections arising in the ordinary transactions of life to the statute's universal application. They raise the points (a) that its application should be restricted to vendor and vendee; (b) not to joint purchasers; (c) the element of partnership arising in the transaction; and (d) the element of bad faith if not actual fraud encouraged thereby. If this decision remained unmodified and of binding force today, we would have no trouble with the controversy here now. It would effectually close the door of equity in plaintiff's face and instantly dismiss his bill. We will find, however, that the objections (and others indicated by the distinguished counsel in this case) of Henderson v. Hudson against the court's sweeping application of this statute, like Banquo's ghost, "would not down," and, we think, have led to very great modifications of that ruling, if not to its entire overthrow in the two states. Before this occurred, however, the old court in Virginia went much farther in the same direction, for in 1817 they affirmed, per curiam, an opinion rendered by Chancellor Carr in 1813, in Jackson's Assignees v. Cutright and Clark, 5 Munf. 308, which held "that payment of the purchase money is not sufficient part performance of a verbal contract for land, to take it out of the statute of frauds." And so late as 1835, in Brent v. Green, 6 Leigh, 16, held: "Sales at auction, in general, are within the statute of frauds"—admitting, however, that judicial sales made by an officer under decree of court and subject to its confirmation, are not within the statute. They divide in that case on the question of "whether a sale by a sheriff, at auction, of an insolvent debtor's interest in real estate under the statute (1 Rev. Code 1819, c. 134, § 34) is within the statute of frauds." This case marks, I think, the farthest limit to which the strict construction view of the statute was carried. Very soon after the pendulum began swinging backward. Although out of chronological order, it is sufficient to say here that this last ruling in Brent v. Green was substantially overruled by Walker v. Herring, 21 Gratt. 678, 8 Am. Rep. 616, where it was held:

"An auctioneer, selling real estate at auction, is the agent of both vendor and purchaser, and his writing at the time the name of the purchaser as such to the written terms of sale binds the purchaser."

Following briefly, for we cannot take time to consider every case, in the revulsion the first case appears in 1836, that of Bank v. Carring-

ton, 7 Leigh, 566, in which the old Union Hotel property in Richmond was involved. John Adams bought it on his own account, but, as Richard Adams was to become security for money to the bank with which to pay, he directed the title to be conveyed to Richard. The payments, so far as made, were made by John, who always held possession and made improvements thereon. Judge Cabell did not sit by reason of relationship to parties; but the other four judges, Brockenbrough, Carr, Brooke, and Tucker, all filed opinions and unanimously held:

"Where land is purchased and paid for by one person, and the conveyance is taken to another, the law will imply a trust for the former; and such purchase and payment may be proved by parol evidence."

It is to be noted that in this case, I believe for the first time, the differences between the English statute and that of the state are clearly pointed out and discussed. And so important is this considered to have been that all four judges dwell upon such distinctions. Judge Brockenbrough calls attention to the fact that the seventh and eighth sections of the English statute, which we have hereinbefore quoted, are wanting, and also that the fourth section is also broader than ours in its terms, inasmuch as it forbids an action "on àny contract of sale of lands, or any interest in or concerning them." Judge Carr calls attention to the fact that in England, prior to this statute of frauds, resulting trusts could be raised and proved by parol, and the effect of the omission of sections 7, 8, and 9 by the legislative enactment of 1785 in Virginia, was to leave them exactly in the same position they were in England under the common law—raisable and provable by parol. Judge Brooke assents and adds:

"So that even parol declarations of trusts, inhibited by the seventh section of the English statute, are exposed by our statute to parol testimony—more dangerous than parol evidence of facts from which to infer a resulting trust, because more liable to be contradictory."

Judge Tucker agrees:

"It is possible that (under our statute) a verbal declaration of trust, if clearly proved, might be sustained."

This decision may well be considered the foundation, one upon which rests the modern doctrine of trust estates in land created and proven by parol, outside of the statute of frauds. The division of the state of Virginia and the establishment of West Virginia occurred concurrent with practically the publication of 15 Grattan, and therefore decisions since that time are not binding in this state; but to show that the holding of Bank v. Carrington is still held in Virginia I cite such cases as Phelps v. Seely, 22 Grat. 573; Briscoe v. Ashby, 24 Grat. 454; Borst v. Nalle, 28 Grat. 423; Miller v. Blose's Ex'r, 30 Grat. 744; Kane v. O'Conners, 78 Va. 76; Sinclair v. Sinclair, 79 Va. 40; Donaghe v. Tams, 81 Va. 132.

Coming, now, to the West Virginia cases, it may be stated in the outset that, notwithstanding the statute of frauds, title to real estate may be asserted and maintained by parol in two distinct classes of cases. First. Under a parol agreement of purchase, accompanied with

(a) possession, (b) payment of purchase money or a part thereof, and (c) improvements made thereon. Second. By a trust, either express, constructive, or resulting. In the first class of cases, the first element, that of possession, is absolutely necessary. When the second element, in the nature of full payment of purchase money, joins the first, full specific performance will be decreed. When the third element, that of valuable improvements, appears with the first, but not the second element, then at least a partial or conditional performance will be decreed. In both classes of cases it is well settled that the testimony to establish the verbal agreement must be definite and made out with reasonable certainty. But by reasonable certainty is not meant mathematical certainty, but that the evidence must leave the court satisfied and convinced as to the terms of agreement, and it must be so definite as to guide the court safely in carrying it into execution. Frame v. Frame, 32 W. Va. 463, 9 S. E. 901, 5 L. R. A. 323.

Touching the first proposition, we may now dismiss it by saying that it is fully established in West Virginia by such cases as Lowry v. Buffington, 6. W. Va. 249; Vickers v. Sisson's Adm'r, 10 W. Va. 12; Tracy v. Tracy's Heirs, 14 W. Va. 243; W. Va. O. & O. L. Co. v. Vinal, 14 W. Va. 637; Snyder v. Martin, 17 W. Va. 276, 41 Am. Rep. 670; Pack v. Hansbarger, 17 W. Va. 313; Middleton v. Selby, 19 W. Va. 167; Campbell v. Fetterman's Heirs, 20 W. Va. 398; Renick v. Ludington, 20 W. Va. 511. The cases establishing trusts by parol are just as numerous. Some of them are Hardman v. Orr, 5 W. Va. 71; Pumphry v. Brown, 5 W. Va. 107; Smith v. Patton, 12 W. Va. 541; Hamilton v. Steele, 22 W. Va. 348; Murry v. Sell, 23 W. Va. 475; Heiskell v. Powell, 23 W. Va. 717; Shaffer v. Fetty, 30 W. Va. 248, 4 S. E. 278; McClintock v. Loisseau, 31 W. Va. 865, 8 S. E. 612, 2 L. R. A. 816; Seiler v. Mohn, 37 W. Va. 507, 16 S. E. 496; Deck v. Tabler, 41 W. Va. 332, 23 S. E. 721, 56 Am. St. Rep. 837; Webb v. Bailey, 41 W. Va. 463, 23 S. E. 644; Marshall's Ex'r v. Hall, 42 W. Va. 641, 26 S. E. 300; Currence v. Ward, 43 W. Va. 367, 27 S. E. 329; Harris v. Elliott, 45 W. Va. 245, 32 S. E. 176; Moore v. Mustoe, 47 W. Va. 549, 35 S. E. 871, 81 Am. St. Rep. 812.

Without considering these cases here in detail, I am constrained to express the opinion that the leading one, the clearest and most satisfactory one, is Currence v. Ward, 43 W. Va. 367, 27 S. E. 329. It may be thought that my judgment in this particular is influenced by the fact that I was counsel in the case; but it will appear by examination of the original record that the answer and defense below was made by a former member of the state Supreme Court of Appeals, Samuel Woods, assisted by one of the ablest former circuit judges the state has had, W. T. Ice, and upon appeal was maintained by the latter, by Judge Snyder a former member of the state Supreme Court, and by other counsel as able as the state has within its limits. It was argued orally and through exhaustive briefs, which I have before me, and after opinion rendered by Judge Dent a rehearing was granted, and a reargument, more exhaustive and thorough, if possible, than at first, was made. Judge Brannon rendered the final opinion, and it

seems to me to show a most thorough, critical, and exhaustive consideration of all the principles involved on the part of this very able judge. The facts in the case were similar in some particulars to those here, Currence's lands were being sold under judicial sale for debt. Currence went to the Wards and had a parol agreement with them that they were to buy them in for him and hold them as security until he paid them the purchase money. They did so, and he paid portions of this purchase money to them. Failing to pay all, the Wards suffered the court's commissioners to resell for unpaid purchase money, at which second sale the Wards again purchased, claiming thereunder exclusive right to the lands and undertaking to sell to Conrad. Before deed made by the commissioners to the Wards, Currence brought the suit, setting up his trust right. In his opinion the learned judge drew clearly what I conceive to be a correct distinction between these trusts, classifying them as (a) direct or positive ones springing from express agreement of parties, and (b) constructive or implied ones, created by equity law; and, following his clear reasoning, these principles may be regarded as settled and no longer open to question in this state:

First. Where one before a sale agrees to buy land in his name for the benefit, in whole or in part, of another, who pays the purchase money or his aliquot part thereof, an express trust arises, enforceable in equity.

Second. Where one buys land under executory agreement, and afterwards, before, however, legal title is passed, verbally agrees that if another will pay the purchase money he shall have the land, and that other does so, the trust is enforceable in equity. But no agreement or payment after legal title passed will be valid under the statute of frauds. This proposition at first blush may sound like an innovation, and may be questioned. Careful consideration, I believe, will cause us to agree with Judge Brannon in its entire soundness. It presents the border line of distinction between parol contracts, trusts, and the operation of the statute of frauds in relation thereto. When a man has the legal title to land, he is presumed to be seised with the possession and to have the undisputed right to sell. If one should make a hundred verbal contracts with him to buy it, and should even pay the purchase money or a part thereof, this would avail him nothing under the statute. If he should, however, by oral contract sell, deliver possession, and receive purchase money, or suffer improvements to be made, the vendee, under the decisions herein cited, can enforce specific conveyance of the legal title. On the other hand, if the vendor does not have legal title, but a mere executory contract, he is presumed to have no possession to render, and cannot specifically perform. He has, under the proposition, received the purchase money, and is in default. It is a mutual obligation of both parties to see that the legal title is secured and vested properly in the vendee. If the vendor seeks to take it in himself, he may defraud his vendee; but in such case equity, before he secures such conveyance, will stay his hand. On the other hand, if the vendee permits him to take the title, he is in fault, and may be deemed to have waived his rights to the land in favor of a demand for the return of his money.

Third. Where one party pays all or a part of the purchase money for land, and title is taken in the name of another, a constructive trust, called a "resulting trust," arises in favor of the party paying as to the whole land, or pro tanto.

Fourth. Both express and constructive trusts in lands can be created, declared, and proven by oral evidence.

Applying these principles to the case here, there comes to me from the evidence, which I will not to any great extent discuss, a full conviction that just prior to the sale of the three tracts, aggregating the 62 acres, by the bankrupt's trustee, Henderson and Henrie did have a verbal agreement, there on the ground, that the land was to be purchased by Henrie, and Henderson was to pay for and take the small parcel off tract No. 1 (estimated to contain 9 acres by some of the witnesses) lying between the county road and the Ohio River Railroad Company's right of way, while Henrie was to take and pay for the balance. The agreement was made between the two parties alone and without witnesses; but it was in a very short time thereafter, on the very same day, communicated and agreed to in the presence of the attorney and representative of the trustee making the sale; this trustee being a corporation. Henrie seeks to qualify the agreement with the condition that Henderson was not to "run it up" on him, and that he did bid it up on him. Henderson says both were to bid, and that he sent his brother to Henrie to ask him when he should stop bidding. Henrie admits this brother coming to him with this question, but says he was so surprised by it he answered nothing, while the brother says he answered, "Well, I do not know; I suppose when the other people quit bidding." Be this as it may, when the two went together to the trustee's attorney, on the ground, immediately after the sale, Henrie seems to have made no complaint on this score, admitted the agreement, and when Henderson declared himself ready to pay his share of the purchase money, but it was found that this would be impracticable, because without survey no one could tell how much was in the parcel he was to have, he volunteered to pay all, with the understanding that Henderson could reimburse him in a few days, and then agreed with Henderson or the parties to make survey and when it should be done, expressing a desire that it should be postponed, however, until the week after the next following one, because of personal business engagements. Even if I had doubt about the evidence, under the clear proof required, being sufficient to establish the agreement made before the sale, so as to establish a direct trust, yet here, in the presence of Henderson, his brother, and Mr. Van Winkle, would be established beyond question a verbal agreement after sale for Henderson to have the parcel, which under the second proposition deduced above from Currence v. Ward. could be enforced; legal title to Henrie not having passed, but, on the contrary, having been enjoined from so passing by reason of the prompt application of Henderson to this court.

Both roads lead to the same place, therefore. But it may be insisted that a vital defect in the plaintiff's case is that Henderson did not pay, and has not yet paid, a dollar of the purchase money. Under ordinary

circumstances this would be a fatal objection, for such payment is made a prerequisite to the establishment of either the direct trust or the oral agreement after sale, but before conveyance of title, and some trouble might have been experienced had the trustee conveyed to Henrie. However, that point does not arise, and under the peculiar circumstances here I am clearly of the opinion that when it was found that Henderson's part of the purchase money could not be determined without survey, and that Henrie then voluntarily and on his own motion paid all, with the statement that Henderson could reimburse him in a few days, manifestly after survey permitted the amount to be determined, he entirely waived this, which otherwise would have been a vital requirement. Henderson alleges his readiness at all times to pay, and Henrie has now clearly expressed his purpose not to receive it. There can be no question in my mind of the jurisdiction of this court in this case. The land in controversy was entirely under control of this court in bankruptcy. Its legal title was in its trustee. It was vital in one view of the case, as I have indicated, that that legal title should not pass from such trustee and become vested in Henrie. No other court could enjoin, because under the bankrupt law this court's jurisdiction was exclusive.

There remains one matter to be determined. Henderson contended he was to pay for his parcel according to its quantity and the sale price per acre. On the other hand, Henrie claims the price was to be fixed by quality and quantity, and not by quantity alone. It is a very difficult question of fact to determine from the evidence; but, thinking it all carefully over, I can see how Henrie could very well entertain such understanding. I am not sure but the equitable right in the premises, independent of evidence so conflicting, should incline me to that view. At any rate I have determined to solve the doubt that way. Much of the testimony in the case has been devoted to showing the relative value of the estimated 9 acres to the balance of the tract. As usual such evidence is wide apart. On Henderson's side, his friends and relatives pretty well agree that it is no better than the rest, while Henrie's friends and relatives are about as well in accord with the proposition that it is worth one acre for two of the rest, with one exception, however. This is his witness Stout, who has been 40 years a surveyor in Wood county, well acquainted with its lands, was one of the appraisers of the bankrupt's estate, and one of the commissioners who surveyed his lands, including these lots in controversy, and laid them off in parcels by direction of the referee, in order to their better sale. I am impressed with this man's sincerity and the soundness of his judgment, and in view of all the conflicting evidence I have determined to follow that judgment, and hold that Henderson must pay 15 per cent more for his parcel than the sale price, because of its quality.

Let there be a decree entered declaring Henderson, for reasons appearing in this opinion, entitled to the relief sought for in his petition, and, to the end that he may have the same, directing a competent surveyor to go upon said 62-acre tract, ascertain its exact quantity, taking care to exclude therefrom any land belonging to the United States

142 F.—37

government on the bank of the river that may by inadvertence have been included under former survey and in the sale, then lay off the parcel in controversy from lot 1, lying between the county road and the right of way of the Ohio River Railroad Company, ascertaining its exact quantity, and report his proceedings as soon as practicable to this court for further decree herein.